# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF FLORIDA

### MIAMI DIVISION

CASE NUMBER: _22-cv-23651-JEM_____

**AISHA GOODISON**

**Plaintiff,**

**v.**

**LOYALTY PROPERTY MANAGEMENT SERVICES, INC.**

**ROLLING GREEN CONDOMINIUM C, INC.**

**Defendants.**

FILED BY _____ D.C.

NOV 0 4 2022

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - MIAMI

## COMPLAINT FOR INJUNCTIVE RELIEF

1. Plaintiff Aisha Goodison ("Plaintiff") hereby sues Defendants, Loyalty Property Management Services, Inc., and Rolling Green Condominium C ("Defendants"), who are both Florida for profit corporations, for Injunctive Relief, legal fees, litigation expenses and costs pursuant to Title III of the Americans with Disabilities Act of 1990, 42 U.S.C. § 12101, in reference to a discriminatory and abusive incident where she was doused in industrial strength chemicals by one of their employees, in what doctors subsequently labelled "a chemical attack."

2. Venue lies in the Southern District of Florida pursuant to 28 U.S.C. §1391(b) and Local Rule

1

1.04, in that the original transaction or occurrence giving rise to this cause of action occurred in this District.

3. Pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1343, this Court has been given original jurisdiction over actions which arise from Defendants' violations of the Americans with Disabilities Act, 42 U.S.C. § 12101.

4. Plaintiff is a Florida resident, is sui juris, and qualifies as an individual with physical disabilities as defined by the ADA.

5. Plaintiff is legally and physically disabled, and a member of a protected class under the ADA 42 U.S.C. §12102(1) & (2), the regulations implementing the ADA as set forth at 28 CFR §§ 36.101 et seq. and in 42 U.S.C. 3602, §802(h).

6. Plaintiff's physical disability was ruled as such by a sitting judge and Social Security Disability in 2011, due to significant damage to the right femoral artery during an angiogram surgery at Jackson Memorial Hospital on October 14, 2008.

7. Plaintiff is substantially limited in the major life activity of walking or standing without severe pain for more than a few minutes at a time, which necessitates constant sitting.

8. Plaintiff's disability is defined in 28 C.F.R. §36.105(b)(2).

9. Plaintiff brings this action against Defendants for discriminatory and abusive conduct under Title III of the Americans with Disabilities Act of 1990, 42 U.S.C. § 12101.

**BACKGROUND**

10. The Plaintiff, Aisha Goodison, is a trained scientist. Plaintiff is also a writer and blogger. She

runs several successful websites, read by millions monthly, and has authored thousands of Library of Congress registered copyrights in Washington, DC.

11. The Defendant, Loyalty Property Management Services, Inc., is a property management company that manages condominium buildings in Miami, Florida.

12. The Defendant, Rolling Green Condominium C, Inc., is a condo association.

13. The Defendant Loyalty Property Management Services, Inc., located at 175 Fontainebleau Blvd, 2-M5, Miami, FL 33172, are responsible for such tasks as managing condominium boards and their by-laws, the collection of maintenance fees from property owners in condominium units, and building maintenance.

15. The Defendant Rolling Green Condominium C, Inc., is a group of condo owners governed by a condo board, with residents acting in positions such as president, and voting on matters concerning the building and its upkeep.

16. The Plaintiff's mother, Millicent Hinds, is the supported living coach/social worker for a 52-year-old mentally disabled man, whose initials are EGJ.

17. Plaintiff's mother has worked with EGJ for over 22-years, as contracted through the government agency, APD (Agency for Persons with Disabilities), which is a sister agency of the Department of Children and Families (DCF).

18. In 2009, the government sent EGJ a check for approximately $25,000 as compensation for underpayments in his Social Security benefits since his birth in 1970.

19. A government review was conducted, and a determination was made that select mentally and or physically disabled Social Security Disability recipients in Florida were given less money than

they were entitled to each month since their disability was declared.

20. Plaintiff's mother arranged for a large portion of the underpayment from the government to be used as a down payment on a condominium for EGJ (solely owned by EGJ), and to conduct repairs and furnish the unit.

21. This would and did reduce EGJ bills every month and saved the government money on his upkeep.

22. Plaintiff's mother, after much searching with a realtor, viewing over a dozen properties, found a foreclosed condominium unit at the Rolling Green C condominium building, located at 1501 NE 191 Street, North Miami Beach, Florida 33179.

23. Plaintiff's mother arranged for a $10,000 check to be issued to Wells Fargo bank as a down payment and the remainder of the money used for closing costs, legal fees, and to renovate the condominium, with such items as buying new kitchen appliances (stove, refrigerator, microwave), service the air conditioning, and purchase furniture and a television.

24. Plaintiff's mother has supervised EGJ in the condo building for the past 13-years and has given him excellent support and assistance in maintaining healthy and productive independent living standards, in accordance with government rules (guidelines issued by APD and DCF in Tallahassee, Florida).

25. Recently, when EGJ informed Plaintiff's mother that his air conditioning unit had stopped working, she obtained an estimate regarding its replacement.

26. The electrician who was retained to do replace the air conditioner had to desist work, as he was hospitalized due to a serious, unrelated foot injury, which nearly resulted in amputation.

4

27. Plaintiff's mother sought another air conditioning replacement and repair company to do the job.

28. Shortly after, EGJ informed Plaintiff's mother that mold has appeared on his living room ceiling.

29. Plaintiff's mother spoke to Wells Fargo, the bank holding the mortgage and insuring EGJ's property, and they dispatched an inspector to the property.

30. Loyalty Property Management Services, Inc., are aware Plaintiff, and her mom are physically disabled and at times have been hostile in their behavior (Plaintiff's mother developed Guillain Barre after a botched flu shot was administered by her former employer's health insurance provider).

31. The discriminatory and abusive treatment is due to disability.

32. The Defendants do not want EGJ in the building and unprovoked were hostile to Plaintiff and her mother at times for peacefully and thoughtfully getting repairs done, in trying to keep a mentally disabled man in his condo that he loves.

33. The hostility spilled over in more ways than one, as Plaintiff sat in front of EJG's condo, not wanting to wait in the unit with toxic mold present, then was deliberately doused in strong chemicals by the Defendants' cleaning lady, Liliana.

34. The Defendants have been highly uncooperative regarding Plaintiff's mother getting EGJ's condo repaired; even a condo board member, Dianela Schrader, came up to Plaintiff on August 11, 2022, while mold remediation company, All Dry, began prep work to remove the mold in the property, and she (Schrader) was scornful and accusatory (of Plaintiff and EGJ who was

present), whilst interrogating Plaintiff for over 20-minutes, and questioning the workers.

35. The Defendants erected many obstacles that complicated matters and prolonged the entire repair process.

36. The Defendants repeatedly omitted pertinent facts and falsely accused mentally disabled, EGJ, of being the reason mold appeared on his living room ceiling, stating "he is special needs" and he "turned off the air conditioning" unit in the day while he was out.

37. There are many hot and humid places in the world without air conditioning in every home, such as the Caribbean, and the homes and apartments do not have mold.

38. Mold comes from the presence of water, such as a leak, corroding a property.

39. A mold infestation can visibly manifest 24-72 hours after a water leak.

40. A thorough inspection by Wells Fargo's insurance unit and a secondary company, All Dry Inc., mold remediation specialists, both concluded the mold was caused by a leak on the third floor above EGJ's condo unit.

41. It was outrageous and defamatory for a Loyalty Property Management Services, Inc. staff member to have blamed, EGJ, for the mold on his ceiling, which was caused by a third floor leak he had absolutely nothing to do with in any fashion.

42. The Plaintiff, due to what she has seen and heard, is of the view, EGJ, is not wanted in the building by some because he is mentally disabled.

43. Not only was EGJ's condo ruined through no fault of his own, due to the third-floor leak, the Defendants' maintenance workers also worked on the windows from outside the building, which

jammed EGJ's windows shut.

44. The Defendants created a death trap for a mentally disabled man, EGJ, via a leak from the third floor, which created potentially deadly mold in his second-floor unit condo, and to add insult to injury, they also jammed the windows shut while allegedly weatherizing them, in a condo where the air conditioning had stopped working.

45. Plaintiff and her mother decided to temporarily house EGJ at their apartment in Miami for six weeks, as the mold in his condo unit presented a threat to health and life.

46. Plaintiff and her mother incurred costs in housing and feeding EGJ from August 11, 2022, to September 18, 2022.

47. These additional expenses are in the form of food costs (groceries and takeout food), Lyft rides and an increase in the electric bill.

48. Plaintiff and her mom prepared his meals, washed his clothes, and sent him to work 5-days per week at the early hour of 5:30AM via the government's STS transportation service, as the mold in his condo was being removed and his bathroom replaced, due to the incident rendering it unlivable.

49. A hotel room would have been too costly ($3,000 per month) and out of EGJ's budget in comparison to his monthly mortgage and condo maintenance fees of approximately $600 per month.

50. Plaintiff (and her mother) also incurred extra costs in Lyft transportation rides to make trips to EGJ's condo in having it repaired, as well as fees from various related services, such as the UPS Store.

51. The government has no mechanism in place for reimbursement in reference to the temporary care of a mentally or physically disabled person.

52. Plaintiff incurred all these costs and time lost during her vacation (August 11, 2022) and during a university semester (which began on August 22, 2022 and ran through October 14, 2022).

53. Repairing Emilio's condo and caring for him at her home has taken away from the Plaintiff's university studies and science patent work.

54. However, she did so to save his life, as the mold problem the Defendants negligently created via the leak upstairs, which has happened before (regarding the walls, due to the building's faulty pipes), presented a significant risk to his health and very life.

55. In fact, EGJ, began persistently coughing due to the mold in the property.

56. One day after temporarily moving in with Plaintiff and her mother, EGJ's persistent cough stopped.

57. On August 15, 2022 a dangerous and damaging incident occurred in front of EGJ's Rolling Green condo unit.

58. The incident occurred outside EGJ's condo unit at approximately 9:30 AM.

59. Due to the fact Plaintiff was off from university on a 3-week summer break, Plaintiff's mother asked her to meet with an air conditioning company at EGJ's condo, while he was at work, and she did paperwork and made calls regarding the repair of the condo.

60. The Plaintiff's mother did not want EGJ to miss a day of work at the popular Miami tourist

8

attraction he has been gainfully employed for over 20-years, to wait for a repairman.

61. Therefore, Plaintiff's mother asked her to go to EGJ's condo and wait on the air conditioning company to inspect the roof (where the air conditioning unit is primarily located) and issue an estimate.

62. The air conditioning company, ARS, who were dispatched by Home Depot, informed Plaintiff they would be at EGJ's condo building between 9AM -12PM on August 15, 2022, to do an inspection and give a free estimate, as that is the way they work.

63. Plaintiff arrived at the Rolling Green condo building at 8:55AM on August 15, 2022 and began waiting outside EGJ's condo unit for ARS to arrive.

64. Plaintiff sat on a chair outside EGJ's condo unit, which she temporarily moved from the laundry room, as she has difficulty standing for more than a few minutes at a time, due to the femoral artery injury that occurred during surgery at Jackson Memorial Hospital.

65. While waiting for ARS, Plaintiff made calls to the workman redoing EGJ's main bathroom, which had to be torn out and replaced due to the mold infestation.

66. The contractor, whose initials are WM, was in a Home Depot store selecting a new bathtub for EGJ's condo.

67. As Plaintiff sat outside EGJ's condo and was speaking on a mobile phone call with contractor, WM, who connected her to the Home Depot cashier in the commercial department, to pay for the bathtub over the phone, without any warning Plaintiff was doused in industrial strength chemicals from above (the third floor).

68. The exterior of the entire building was completely dry, and it was a clear, sunny day.

69. There was no liquid or water anywhere on the building's walkways or parking lot prior to the incident.

70. There were no signs warning of maintenance workers dumping liquids over balconies, as engaging in such conduct is improper, illegal and a violation of health and safety rules.

71. Furthermore, it was a strange and illogical place to start cleaning, as EGJ condo unit is on the second of four floors and not located near the elevator or exit.

72. When Plaintiff was doused in industrial strength chemicals by the cleaning lady, Liliana, she was in shock, screamed out, then looked up to see where the chemicals were coming from.

73. Plaintiff saw the Defendants' cleaning lady, who upon information and belief is named "Liliana" (see photos), looking down on her from the third floor, with a malicious and smug look on her face.

74. Plaintiff screamed at her "are you crazy!?" and asked her why she dumped chemicals all over her.

75. The cleaning lady, seeing Plaintiff in pain and distress, smirked at Plaintiff with an evil look on her face, nonchalantly shrugged, then walked off out of view; she made no attempt to ascertain if the Plaintiff was okay or needed medical assistance from emergency services.

76. Plaintiff was doused in toxic, industrial strength chemicals that landed on her head, face, breast/chest, thighs, arms, and ears.

77. Within seconds Plaintiff began to feel her eyes, skin and right ear burning and stinging.

78. Plaintiff's tongue also started going numb, as the contents of the liquids the cleaning lady

illegally dumped from the third floor, went into Plaintiff's mouth as she spoke on the telephone.

79. Plaintiff searched for EGJ's key in her bag, opened the front door and went into his condo's kitchen.

80. Plaintiff quickly began flushing her eyes and face with water for approximately 2-minutes.

81. Plaintiff also called 911 (paramedics) out of concern, as she did not want the harsh, industrial strength cleaning chemicals that went into her eyes to lead to blindness.

82. Both of Plaintiff's eyes were burning and stinging, particularly the right eye, which made her alarmed she could go blind.

83. When paramedics arrived and spoke to Plaintiff, they asked her what occurred leading to the injury.

84. Plaintiff explained to the paramedics what transpired.

85. When Plaintiff stated of the cleaning lady, "I tried to see where she went" but could not, a paramedic responded, "The cleaning lady is hiding."

86. The main paramedic also stated, "we can take you to the emergency room and they can put drops in your eyes" which is why Plaintiff dialed 911.

87. Plaintiff agreed, expressing that is the reason she called 911, hoping she could get treatment in the emergency room that could save her vision from any further harm.

88. The paramedic also instructed Plaintiff to go back into the kitchen and keep flushing her face and eyes with water for approximately ten more minutes.

89. Plaintiff also began washing out her hair with water, as some of the industrial strength cleaning chemicals landed on her head.

90. Paramedics asked for Plaintiff's state identification card, which she provided.

91. When the ambulance arrived some of the paramedics escorted Plaintiff to the stretcher that was waiting by the second-floor elevator.

92. As Plaintiff made her way to the elevator with paramedics, she saw the cleaning lady who had doused her in chemicals, being questioned by additional paramedics, who were waiting with the stretcher.

93. Plaintiff, still angry over the incident and the level of pain she was in, began yelling at the cleaning lady "are you crazy" and asked her why she dumped the chemicals on her head.

94. Plaintiff also demanded to know, "what was in the chemicals?" as it was bizarre regarding the skin and eye irritation it produced and the smell of something toxic.

95. The Plaintiff wanted to know what was in the chemicals to tell the emergency room doctor, which would enable the physician to render more precise medical treatment to counteract or mitigate the effects of the toxins.

96. The cleaning lady refused to tell Plaintiff or the paramedics, who also asked, what was in the chemicals she dumped on Plaintiff from the third floor.

97. Plaintiff quickly snapped photos of the cleaning lady and her cart full of industrial strength, chemical cleaning products (Exhibit A).

98. The cart contained bleach, degreaser and other toxic cleaning chemicals.

99. The cart also contained buckets, one of which had black, filthy water inside it.

100. Plaintiff was transported to Jackson North Medical Center and taken straight to the emergency room.

101. Plaintiff was treated by an emergency room doctor, who administered Tetracycline eye drops to her red, inflamed, pained eyes.

102. Tetracycline is an antibiotic used to treat eye infections and doubles as a pain reliever.

103. Untreated eye infection can cause loss of vision and necessitate surgical removal of the eyes.

104. Plaintiff was also prescribed artificial tears by the emergency room doctor.

105. Plaintiff purchased the artificial tears at the Jackson North Medical Center pharmacy.

106. Shortly after Plaintiff arrived home on the evening of August 15, 2022, after being discharged from the hospital, she began having severe stomach cramps and nausea.

107. Plaintiff was forced to make frequent trips to the bathroom due to the stomach cramps and nausea.

108. Plaintiff woke up the next day with severe eye pain, very watery eyes, and a feeling of grittiness in the right eye, as though something was lodged inside the lids.

109. Plaintiff's eyes keep alternating between being very dry and irritated, to tears flowing from them as though she is crying, when she is not, at different intervals throughout the day.

110. After reading the hospital discharge instructions with cloudy vision, Plaintiff became aware

that her symptoms are that of chemical eye exposure.

111. The hospital discharge instructions stated Plaintiff should make an appointment with her family doctor.

112. Plaintiff called Nova Medical Center and made an appointment.

113. Plaintiff was seen on Friday August 19, 2022, by two doctors at Nova Medical Center, located at 1750 NE 167Street, North Miami Beach, Florida 33162.

114. The senior physician stated the severe stomach cramping Plaintiff began experiencing shortly after the chemical exposure, which continued for a week, is gastroenteritis due to the chemicals that were dumped on Plaintiff, having entered her mouth, and gone into her stomach (Plaintiff's tongue was numb for 2-days due to the toxic chemicals having entered her mouth during the chemical attack by the cleaning lady).

115. The senior physician also diagnosed Plaintiff with conjunctivitis, regarding the eye inflammation and pain from the chemical exposure.

116. Plaintiff's doctor stated the body is trying to rid itself of the toxins it was exposed to due to the incident on August 15, 2022; hence the gastroenteritis and conjunctivitis.

117. Plaintiff's doctor made a request for a referral to an ophthalmologist in Fort Lauderdale, Florida.

118. Days later on Saturday, September 3, 2022, Plaintiff noticed her skin/(right)breast had developed a large, red, irritated, painful cyst, having appeared on her chest where the toxic, industrial cleaning fluids had been dumped on her by the cleaning lady.

119. The pain from the cyst/boil woke her out of her sleep, as it became that intense.

120. Plaintiff became very alarmed and distressed at the huge cyst that suddenly appeared on her chest, under the skin, and was protruding, because as a scientist she knows the dangers thereof.

121. Plaintiff had never experienced anything like this before and it was frightening.

122. Plaintiff's doctor has given her a written referral to see a specialist regarding medical scanning of the area.

123. Plaintiff is still having eye pain and watery eyes every day (with a significant sensitivity to light and eye pressure).

124. Plaintiff's vision is also impaired as it becomes cloudy at different intervals during the day and night.

125.   Plaintiff is a university student, and this incident has caused difficulty, discomfort and pain when doing coursework.

126. Plaintiff has experienced great emotional and physical trauma due to the incident that occurred on August 15, 2022.

127. It was a mean spirited, malicious and illegal thing for the cleaning lady to do.

128. It could have created a slip and fall with injury or death, or as seen in this legal action, lasting pain, and vision damage.

129. What if a baby had been present when the cleaning lady decided to dump cleaning liquids from the third floor, in what would have caused massive injury to a child.

130. The Defendants are squarely responsible for the injuries Plaintiff sustained on August 15, 2022, as documented by medical providers.

131. One of Plaintiff's doctors stated to her "I'm sorry someone tried to melt the skin off your face."

132. There was a duty of care, and the Defendants breached it in acts of reckless and wanton negligence, resulting in serious injury to the Plaintiff, who could go blind.

133. Exposure to toxic chemicals also promotes cancer.

134. Due to the poor maintenance of the Rolling Green Building C, Plaintiff and her mother have been put through a terrible ordeal.

135. In fact, Plaintiff's elderly mother became so distressed and stressed when she visited the condo after all the problems had occurred and an assessment of the unit was being done, she had to be rushed to the emergency room via ambulance, as she had become unresponsive and was experiencing a stress induced seizure for the first time in her life, with her blood pressure and heart rate moving at unsafe rates.

136. Plaintiff's mother was hospitalized over the incident, which would not have happened to her, had the Defendants properly maintained their building and not hired a lawbreaking cleaning lady that injured Plaintiff, bringing Plaintiff's mother stress and worry.

**PRAYER FOR RELIEF**

137. $50,000 in compensatory damages.

138. $5,000,000 in punitive damages.

139. The Court award legal fees, costs and litigation expenses pursuant to 42 U.S.C. § 12205; and The Court provide such other relief as the Court deems just and proper, and/or is allowable under Title III of the Americans with Disabilities Act.

**PROCESS SERVICE**

**The Plaintiff attests this lawsuit will be served on the Defendants in a timely fashion.**

Rolling Green Condominium C, Inc.

Registered Agent: Kaye Bender Rembaum

1200 Park Central Blvd. South

Pompano Beach, FL 33064


Loyalty Property Management, Inc

Registered Agent: Frank Garcia

175 Fontainebleau Blvd

Suite 2-M5

Miami, FL 33172


**Respectfully submitted by Aisha Goodison (pro se):**

20873 NW 9th Court Apt 202

Miami, Florida 33169

(786) 681-7490

sonfl@bellsouth.net


Date: 11-4-22